UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re: Steve L. Lobato,                               No. 7-07-10301-MA

       Debtor
_____

Laurie Williams,

       Plaintiff,

v.                                                    Adversary No. 07-1071 M

Steve L. Lobato,

       Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court at a trial on the merits on the Plaintiff's Complaint to Determine Dischargeability. The Complaint alleges that Defendant made false representations to Plaintiff in connection with Defendant's participation in the construction of a residential home, and that the Defendant's false representations were willful and malicious thereby causing economic and emotional damages that should be determined non-dischargeable under 11 U.S.C. § 523(a)(2)[1] and (a)(6)[2]. Plaintiff also alleges that Defendant owed her a fiduciary duty and

---

[1] That Code section provides:
    A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt--
        (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -
            (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition;

[2] That Code section provides:
    A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt--
        (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

committed fraud while acting in his fiduciary capacity in violation of 11 U.S.C. § 523(a)(4)[3].

Defendant opposes Plaintiff's claims, primarily asserting that Plaintiff failed to establish any damages.

Following the presentation of Plaintiff's case in chief the Court granted Defendant's motion for directed verdict on the claims brought under 11 U.S.C. §523 (a)(6). The Court took the remaining claims, based on 11 U.S.C. §523(a)(2) and (a)(4), under advisement. After consideration of the evidence and testimony presented to the Court on the remaining claims, review of the relevant case law and applicable statutes, and being otherwise fully informed, the Court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

1. Defendant filed a voluntary petition under Chapter 7 of the Bankruptcy Code on February 9, 2007.

2. Defendant and Plaintiff, Laurie Williams, organized a corporation known as Tortuga Homes, Inc. ("Tortuga") in August 2005. Defendant and Ms. Williams executed Articles of Incorporation, Bylaws and a Shareholders' Agreement in the process of forming Tortuga.

3. Defendant and Plaintiff were the sole and equal shareholders of Tortuga.

4. The purpose of Tortuga was to acquire real property for improvement and sale.

5. Plaintiff's duties under the organizing agreements for Tortuga state that she was to loan

---

[3] That Code section provides:
    A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not
    discharge an individual debtor from any debt--
        (4) for fraud or defalcation while acting in a fiduciary capacity,
embezzlement, or larceny;

2

money to Tortuga for operations and to provide accounting and financial services.

6. Plaintiff obtained a $250,000 personal loan in order to loan money to Tortuga for operations.

7. According to the organizing documents, the parties would not receive any salary or other profit during any construction project but would split any residual profit after any loans made by Plaintiff were repaid with interest.

8. Defendant's duties under the organizing agreements for Tortuga state that he was to supervise construction and sales activities. Defendant was also expected to become the qualifying party with Construction Industries Division on behalf of Tortuga.

9. During this time, Defendant was the sole owner and operator of an incorporated construction company, Expert Framing. The parties contemplated that Expert Framing would perform the framing of any construction project Tortuga would undertake.

10. In July 2005 vacant land located in Rio Rancho was purchased by Plaintiff on behalf of Tortuga for the construction of a home for resale. The vacant land consisted of four lots. The purchase price for the land was $132,000.

11. In November or December 2005, Torgtuga began construction of a home on one of the lots located at 15 Second Street in Rio Rancho, New Mexico ("Second Street Home"). Tortuga was the general contractor for this construction project.

12. Initially, Defendant obtained bids for excavation and construction of the foundation of the Second Street Home. Defendant submitted the bids obtained from Chavez Concrete for the construction of the foundation which he provided to Plaintiff in order to obtain funds. Defendant requested funds equal to half the amount of the estimate to start the construction. The remaining balance was to be paid upon completion of the foundation.

13. Despite his representations, Defendant did not hire Chavez Concrete to perform the construction of the foundation of the Second Street Home. Instead, Expert Framing did the work.

14. Later during construction, Defendant presented Plaintiff with an invoice from Barraza Construction for the purchase of materials and installation of drywall. Plaintiff tendered funds to Defendant in a check payable to Expert Framing. Again, despite his representations, Defendant did not hire Barazza Construction to install the drywall. Expert Framing did the work.

15. From the beginning of construction, Defendant represented to Plaintiff that she should tender funds to Expert Framing for deposit in its account. Defendant informed Plaintiff that bills for subcontractors and materials should be paid by Expert Framing because Tortuga did not have a non-taxable transaction certificate.

16. Later during the construction process, Defendant instructed Plaintiff to tender funds payable to Lobato Builders to facilitate the purchase of building supplies, and construction materials and to pay for subcontracted labor because Tortuga still did not have a non-taxable transaction certificate.

17. Lobato Builders was Defendant's Father's business. Defendant testified that his father allowed him to use Lobato Builder's checking account.

18. During the course of the construction process, Plaintiff tendered funds to Defendant in the form of checks made payable to either Expert Framing or Lobato Builders so that Defendant could hire and pay subcontractors and purchase building materials. Plaintiff tendered funds in the amount of $108,946.57 itemized as follows:

    a. On December 22, 2005, Plaintiff tendered Check No. 1009 payable to Expert Framing in the amount of $1,050.00 for MHX.

b. On December 22, 2005, Plaintiff tendered Check No. 1010 payable to Expert Framing in the amount of $7,987.50 for Chavez Concrete.

c. On December 22, 2005, Plaintiff tendered Check No. 1011 payable to Expert Framing in the amount of $3,972.40 for Total Service.

d. On January 4, 2006, Plaintiff tendered Check No. 1012 payable to Expert Framing in the amount of $7,987.50 for Chavez Concrete.

e. On January 11, 2006 Plaintiff tendered Check No. 1013 payable to Expert Framing in the amount of $2,165.00 for Western Builders (windows).

f. On January 11, 2006 Plaintiff tendered Check No. 1014 payable to Expert Framing in the amount of $3,300.00 for Truss World.

g. On January 111, 2006 Plaintiff tendered Check No. 1015 payable to Expert Framing in the amount of $6,000.00 for Lumber, Inc.

h. On January 11, 2006 Plaintiff tendered Check No. 1016 payable to Expert Framing in the amount of $4,250.00 for partial payment of labor for framing.

i. On January 19, 2006 Plaintiff tendered Check No. 1019 payable to Expert Framing in the amount of $4,250.00 for balance due owed on labor for framing.

j. On January 19, 2006 Plaintiff tendered Check No. 1020 payable to Expert Framing in the amount of $4,000.00 for Lumber, Inc.

k. On January 25, 2006 Plaintiff tendered Check No. 1021 payable to Expert Framing in the amount of $3,972.00 for Total Service (plumbing).

l. On January 25, 2006 Plaintiff tendered Check No. 1022 payable to Expert Framing in the amount of $3,400.00 for deposit for electrical work.

m. On January 25, 2006 Plaintiff tendered Check No. 1023 payable to Expert Framing in the amount of $3,400.00 for deposit for mechanical work.

n. On January 25, 2006 Plaintiff tendered Check No. 1024 payable to Expert Framing in the amount of $6,000.00 for permit for next house.

o. On January 31, 2006 Plaintiff tendered Check No. 1025 payable to Expert Framing in the amount of $6,000.00 for cabinets.

p. On January 31, 2006 Plaintiff tendered Check No. 1026 payable to Expert Framing in the amount of $4,000.00 for doors and hardware.

q. On February 13, 2006 Plaintiff tendered Check No. 1027 payable to Expert Framing in the amount of $2,677.97 for doors and hardware, roofing.

r. On February 13, 2006 Plaintiff tendered Check No. 1029 payable to Expert Framing in the amount of $5,775.00 for Barraza Stucco.

s. On February 13, 2006 Plaintiff tendered Check No. 1030 payable to Expert Framing in the amount of $1,800.00 for insulation.

t. On February 22, 2006 Plaintiff tendered Check No. 1033 payable to Expert Framing in the amount of $7,025.00 for drywall.

u. On March 13, 2006 Plaintiff tendered Check No. 1037 payable to Expert Framing in the amount of $4,850.00 for paint, materials, labor, door install, stain labor.

v. On March 13, 2006 Plaintiff tendered Check No. 1038 payable to Expert Framing in the amount of $1,400.00 for driveway.

w. On April 6, 2006 Plaintiff tendered Check No. 1044 payable to Steve Lobato in the amount of $148.00 for kitchen sink.

   x.  On May 2, 2006 Plaintiff tendered Check No. 1690, from her personal bank account, made payable to Lobato Builders in the amount of $13,536.20 for completion of the Second Street Home.

19.   Each time Plaintiff tendered a check to Defendant she wrote the name of the subcontractor, supplier or purpose of the payment in the memo section to identify how the funds would be used.

20.  Plaintiff testified that Defendant provided to Plaintiff copies of proposals from the subcontractors each time he requested funds.  Defendant testified that sometimes he would call Plaintiff to request funds and then just go pick up a check.

21. Tortuga hired Defendant and/or Expert Framing as a subcontractor to perform the framing at the Second Street Home.

22.  Plaintiff testified that Expert Framing was only retained to perform those aspects of the project related to the framing of the house at actual cost.

23. Defendant testified that he believed that Expert Framing could do any or all of the work if it was able to but that he did not specifically inform Plaintiff that Expert Framing would be doing other work on the Second Street Home.

24.  Defendant further testified that Plaintiff should have known Expert Framing was doing the work since she could have seen its employees working at the jobsite.

25.  Defendant did not in many instances hire the subcontractors whose bids he submitted to Plaintiff.  In fact, Defendant performed much of the construction through his business, Expert Framing.

26. At the beginning of construction Expert Framing only performed work at the Second Street Home.  At some time during the project Expert Framing began performing work at other construction jobs while still working at the Second Street Home.

27. Defendant, on behalf of Tortuga, hired Jerry Gallegos to work on the Second Street Home as well as unrelated projects on behalf of Expert Framing.

28. During construction, Defendant requested Mr. Gallegos prepare back up receipts from subcontractors because otherwise Defendant could not take his next draw from Plaintiff. Mr. Gallegos specifically testified, "I was asked to forge documents to give to [Plaintiff]."

29. Defendant is unable to determine which payments made to Expert Framing employees from the Expert Framing bank account are attributable to construction performed at the Second Street Home.

30. In May 2006, prior to Plaintiff's departure on a vacation, Defendant requested additional funds for the completion of the home. Plaintiff issued checks for the requested funds, including a check for $1,400.00 for the construction of the driveway at the Second Street Home.

31. Defendant hired Jerry Gallegos to complete the driveway. Defendant testified he paid Mr. Gallegos $700.00 for the work. Defendant kept the remaining $700.00. The driveway was not completed. The remaining funds were not returned to Plaintiff.

32. On January 25, 2006 Plaintiff paid Defendant $6,000.00 to obtain a building permit and to start drawing plans for the construction of a house on the property adjacent to the Second Street Home. Defendant did not obtain a permit and did not return the funds to Plaintiff.

33. Plaintiff discovered the Second Street Home was not completed upon her return from vacation.

34. Defendant did not complete the construction of the Second Street Home.

35. Plaintiff expended personal funds in the amount of $15,508.25 to complete the Second Street Home in order to obtain a certificate of occupancy and to allow her to sell the property.

36. The construction of the Second Street Home cost $175,886.95 including the cost of the lot, but not including interest.

37. Defendant did not provide an accounting of the funds expended in the construction of the Second Street Home.

38. The construction of the Second Street Home was completed and Plaintiff received a Certificate of Occupancy on September 27, 2006.

39. The Second Street Home sold for $179,000.00. The sale closed November 16, 2006.

40. Plaintiff used the sale proceeds towards repayment of the $250,000.00 loan.

41. Plaintiff repaid the entire loan plus interest of $26,099.02.

## Conclusions of Law

**A. Violation of 11 §U.S.C. 523(a)(4)**

Under §523(a)(4) a debt is -non-dischargeable if the debtor committed "fraud or defalcation while acting in a fiduciary capacity..." 11 U.S.C. §523(a)(4). To prevail under this subsection, Plaintiff must establish that a fiduciary relationship between herself and Defendant existed, that funds or property were entrusted to him, and that Defendant committed fraud or defalcation in the course of that fiduciary relationship.[4] Once that proof is made, the burden shifts to the debtor-fiduciary to account for the entrusted funds.[5]

---

[4] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1267, 1371 (10th Cir. 1996)(Creditor has the burden to prove the fiduciary relationship; existence of fiduciary relationship is a legal issue);*Watson v. Parker (In re Parker)*, 264 B.R. 685, 700 (10th Cir. BAP 2001); *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997).

[5] *In re Tatro*, 387 B.R. 833 (Bankr.Kan.2008)(citing *Otto v. Niles (In re Niles)*, 106 F.3d 1456 (9th Cir.1997)); *Storie*, 216 B.R. at 288 (burden shifts to the debtor-fiduciary to render an accounting to show that it complied with its fiduciary duties, citing *Niles* with approval and further noting that the Tenth Circuit never reached whether a defalcation had occurred in *In re*

8

The existence of a fiduciary relationship under §523(a)(4) is determined under federal law.[6] However, state law is relevant to this inquiry.[7] To find a fiduciary relationship under this section the Court must find that an express or technical trust existed between the parties.[8] An express trust may involve a formal declaration of trust or a situation where the intention of the parties to form a trust relationship may be inferred by the surrounding facts and circumstances.[9]

An express trust may also be created by agreement entrusting a res of property to the debtor.[10] A technical trust is a trust imposed by statute.[11] Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of §523(a)(4).[12]

---

*Young* and therefore did not address the appropriate burden of proof for proving a defalcation).

[6] *In re Turner* 134 B.R. 646, 649 (Bankr. Okla. 1991)(both state and federal must be consulted to determine whether a fiduciary relationship exists); *see also In re Shultz*, 205 B.R. 952, 958 (Bankr. N.M. 1997).

[7] *Shultz,* 205 B.R. at 958 (applicable state law determines whether express or technical trust relationships exist and whether a trust was created. The Court reviews state law to ascertain whether a basis exists for finding a debtor's status imposed a fiduciary obligation sufficient to meet the strictures of §523(a)(4)).

[8] *Fowler Bros*. 91 F.3d at 1371.

[9] *In re Steele*, 292 B.R. 422, 427 (Bankr. Colo 2003)(quoting *In re Turner* 134 B.R. 646, 649 (Bankr. Okla. 1991))("[The] relationship springs from an attitude of trust and confidence and is based on some form of agreement, either expressed or implied...")(quoting *Lowrence v. Patton* 710 P.2d 108, 112 (Okla. 1985)).

[10] *Fowler Bros*. at 1372; *In re Tucker*, 346 B.R. 844, 850 (Bankr.E.D.Okla.2006)(The elements of an express trust are the intent to create a trust, a clearly defined trust res, and specific trust duties.)

[11] *Fowler Bros*. at 1372.

[12] *Fowler Bros*. at 1371-72 (citing *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir.1976).

9

Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy.[13] Defalcation is the failure to account for money or property that has been given to one.[14]

New Mexico case law, in certain instances, has held that shareholders of closely held corporations owe each other fiduciary duties.[15] In *Walta v. Gallegos,* the New Mexico Court of Appeals analyzed the genesis of their analogy that closely held corporations are likened to partnerships except that partners are provided statutory protections not available to corporate shareholders.[16] The Walta Court stated that "[t]he general rule has been sufficiently developed by appellate opinions to establish that the fiduciary duty does not depend on shareholder control, but rather arises out of the nature of a closely held corporation."[17] The duty between shareholders of a close corporation is similar to that owed by directors, officers, and shareholders to the corporation itself; that is, loyalty, good faith, inherent fairness, and the obligation not to

---

[13] *Id.*

[14] *Turne*r, 134 B.R. at 658; *Storie*, 216 B.R. at 283 (fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, wilful, reckless, or negligent.); .

[15] *Cf Walta v. Gallegos Law Firm, PC.* 131 N.M. 544, 552-553, 40 P.3d 449 (Ct. App. 2002)(although holding that shareholders owe fiduciary duties to disclose material facts in the purchase of stock from a minority shareholder, the court reasoned that closely held corporations are similar to partnerships wherein partners owe one another fiduciary duties); *Meiboom v. Carmody*, 134 N.M. 699, 704, 82 P.3d 66, 72 (Ct. App. 2003)(holding that shareholder owed fiduciary duty to other shareholders of closely held corporation because of the nature of the business relationship).

[16] *Id* at 553

[17] *Id* at 551.

10

profit at the expense of the corporation.[18]  Generally, 10th Circuit courts have held that the fiduciary duties imposed on partners by the Uniform Partnership Act do not rise to the level required under §523(a)(4). [19] Those courts that found a fiduciary duty arising under §523(a)(4) in the partnership or closely held corporation setting made the determination because trust elements were also present.[20]  In cases where courts have not found a fiduciary duty, there were no references to trust property or descriptions of specific duties.[21]  "In the 10th Circuit, when a fiduciary duty under 11 U.S.C. §523(a)(4) is found, the cases universally find a much more specific basis for the duty than those general duties of good faith and fair dealing".[22]

      Here, Plaintiff and Defendant formed a closely held corporation, Tortuga.  As part of their agreement, Plaintiff and Defendant were equal owners of Tortuga.  Plaintiff agreed to provide financing and accounting services for the operation of Tortuga while Defendant would hold the necessary licences to enable Tortuga to build residential homes and supervise the building process.  Under the parties' agreement and memorialized in the corporate documents, Defendant had other specific duties: he was responsible for the hiring, supervision, and payment

---

[18] *Walta*, 131 N.M. at 553 (citing *DiLaconi v. New Cal Corp*., 97 N.M. 782, 788, 643 P.2d 1234, 1240 (Ct.App.1982)).

[19] See, e.g., *Steele*, 292 B.R. at 430- 431 (citing *Beebe v. Schwenn* (*In re Schwenn*), 126 B.R. 351, 353 (Bankr. D.Colo.1991)(finding that Colorado common law imposes fiduciary duty on partners who hold property of the partnership in trust); *Medved v. Novak* (*In re Novak & In re Lattimore*), 97 B.R. 47, 59 (Bankr.D.Kan. 1987)(partnership act did not impose a fiduciary duty rising to the level required under §523(a)(4)); *Arnett v. Weiner* (*In re Weiner*), 95 B.R. 204, 206 (Bankr.D.Kan.1989)(statute did not create 523(a)(4) duties but additional facts showed Debtor acted as a fiduciary)).

[20] *Beebe*, 126 B.R. at 353.

[21] *Medved,* 97 B.R. at 59.

[22] *Steele*, 292 B.R. at 428, 431- 432.

11

of subcontractors. As a result of Tortuga's lack of non-taxable transaction certificate, Defendant convinced Plaintiff that the payments for subcontractors and other materials should be run through Expert Framing and Lobato Builders' bank accounts. From the inception of the project, the parties intended that Defendant would be entrusted with funds, the trust res, to be used for the specific purpose of paying subcontractors for their work on the Second Street Home. During the entire time Defendant was involved in the construction of the Second Street Home, Plaintiff tendered funds to Defendant for the hiring of subcontractors and payment for materials to facilitate the construction process. The facts that give rise to a trust are undisputed: Defendant was entrusted with funds specifically earmarked for payment of identified subcontractors and for materials.

The Court does not find the existence of an express trust solely based on the business relationship being a closely held corporation but in combination with the parties' course of business dealings. Based on the facts surrounding the parties' business relationship, there was a specific trust res and Defendant's duties were clearly specified; the Court therefore finds that an "express" trust was established.

The evidence and testimony establish that Defendant received approximately $108,946.57 for payment of subcontractors and for the purchase of materials and supplies. Defendant deposited these funds into Expert Framing and Lobato Builders bank accounts. Defendant used Expert Framing employees to perform a substantial amount for the labor on the Second Street Home and paid these employees out of the Expert Framing bank account. Defendant testified that he cannot specifically identify which checks were written for labor and materials for the Second Street Home as opposed to other construction projects that were

12

performed contemporaneously. Plaintiff did not introduce any evidence or testimony identifying any other sources of funds Expert Framing received to pay for labor and material on the other projects or whether the funds received from Plaintiff were used. Defendant did not provide an accounting to identify receipts and their respective sources or expenditures and to what project each expenditure was designated.

Ultimately, Defendant did not complete the construction of the Second Street Home and Plaintiff was forced to spend an additional $15,508.25 to hire subcontractors for completion of the project. Plaintiff paid Defendant $1400 for completion of the driveway. The driveway was not completed. Defendant testified he made a partial payment to subcontractor, Jerry Gallegos, of $700 for the construction the driveway. Defendant did not pay Mr. Gallegos the remaining $700 and failed to return the funds to Plaintiff. Plaintiff paid Defendant $6000 to obtain building permits for construction of a second home on a property adjacent to the Second Street Home. Defendant did not obtain the permit and did not return the funds received.

The Defendant argues that the Plaintiff did not suffer damages: althought she borrowed $250,000 plus interest of $26,000, there should be an offset because she still owns three lots worth at least $93,000 and she sold the Second Street Home for $179,000. Defendant also points out that there is only a $6,000 difference. These arguments are not relevant to whether Defendant was a fiduciary, the existence of the trust or if Defendant committed a defalcation. The Defendant was entrusted funds for the construction, failed to account for the funds, and failed to return funds that were not used as designated. The evidence and testimony establish that Defendant failed to account for the majority of the funds he received for construction of the Second Street Home. The Court concludes that as a matter of law that Defendant defalcated

13

property held in trust while acting in a fiduciary capacity and he is not entitled to discharge of the debt.

At trial, Plaintiff did not seek a specified amount of damages so the Court is left to determine and calculate appropriate damages based on evidence admitted at trial. Plaintiff completed the construction of the Second Street Home by expending an additional $15,508.25 and then sold the property for $179,000.00.[23] Plaintiff applied the net sale proceeds to repay a portion of the $250,000 loan obtained to finance the parties' business venture. Plaintiff ultimately repaid the balance of the loan in full. Plaintiff retained possession of the remaining three (3) lots, purchased at the same time as the Second Street Home, which the Court assigns a value of $99,053.52.[24] Plaintiff claimed accrued interest on the $250,000.00 loan in the amount of $26,000.00 but did not provide any evidence or testimony reflecting the amount of interest applicable to the Second Street Home or the retained lots individually.[25] Therefore, the Court calculates damages as follows: the amount of the loan, plus accrued interest, plus cost of completion plus accrued interest on the cost of completion less the net sales price, less the value of the remaining lots and less the accrued interest on the remaining three lots. Based on the foregoing, the Court finds Plaintiff is entitled to damages in the amount of $15,657.46. [26]

---

[23] Exhibit 5 admitted at trial included the settlement statement reflecting "Cash to Seller" in the amount of $166,601.36

[24] Exhibit 5 also included the Final Settlement Statement reflecting the purchase price of the four lots in the amount of $132,071.34. Dividing by four (4), each lot has a value of $33,017.84.

[25] The Court calculated the interest applicable to the retained lots by multiplying 99/250 by the total interest figure of $26,000.

[26] Itemized damage calculation

14

Plaintiff did not prove any other damages.

**B. Violation of 11 §U.S.C. 523(a)(2).**

Plaintiff also asks this Court to deny discharge of her damages under 11 U.S.C.§523(a)(2). Under §523(a)(2)(A) a court may deny a discharge of a debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C.§ 523(a)(2)(A). Under this subsection the creditor must show by a preponderance of evidence that: the debtor made a misrepresentation; the debtor made the misrepresentation with the intent to deceive; the creditor justifiably relied on the misrepresentation; and that the misrepresentation caused the creditor to sustain damages.[27] Discharge provisions will be strictly construed against the creditor and liberally construed in

| Initial Loan | $ 250,000.00 |
|---|---|
| Plus Accrued Interest | $ 26,000.00 |
| Plus Completion Cost | $ 15,508.25 |
| Plus Interest on Completion Cost from Certificate of Occupancy (9/27/2006) to Closing (11/10/2006): 44 days at 7.75% interest (at note rate.) | $ 144.89 |
| Less Net Sales Price | $ (166,601.36) |
| Less Value Three Retained Lots | $ ( 99,053.52) |
| Less Interest applicable to retained Three Lots ((99/250)x$26,000.00) | $ (10,340.80) |
| **Grand Total** | $ 15,657.46 |

[27] See *Young*, 91 F.3d at 1373(setting forth the requirements for a 523(a)(2)(A) claim); *Field v. Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351(1995) (establishing "justifiable" standard of reliance); *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 657, 112 L.Ed.2d 755 (1991)(establishin preponderance of evidence standard of proof for dischargeability actions.)

favor of the debtor.[28]

The first element under §523(a)(2)(A) requires a showing of actual fraud or false pretenses or false representation or willful misrepresentation.[29] "False pretenses" or "representations" are representations knowingly and fraudulently made that give rise to the debt.[30] Courts have defined "fraudulent misrepresentation" as: "one who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."[31]

The second element under §523(a)(2)(A), intent to deceive, is a question of fact which can be inferred based on the totality of circumstances.[32] Because a debtor rarely admits an intent to defraud, a Plaintiff can satisfy the scienter element through circumstantial evidence from which the Court may infer the requisite intent to defraud.[33] The Court must consider the totality of the circumstances as of the time the representation was made to determine whether a debtor

---

[28] See *Bellco First Fed. Cr. Union v. Kaspar* ( *In re Kaspar*), 125 F.3d 1358, 1361 (10th Cir. 1997).

[29] *In re Audley*, 268 B.R. 279, 282 (Bankr.D.Kan. 2001.)

[30] *In re Lang*, 293 B.R. 501, 514 (10th Cir. BAP 2003)(citing *Driggs v. Black* (*In re Black*), 787 F.2d 503, 506 (10th Cir.1986), abrogated in part on other grounds, *Grogan v. Garner*, 498 U.S. 279, 283, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

[31] *In re McGuire*, 284 B.R. 481, 488 (Bankr.D.Colo. 2002)(citing Restatement (Second) of Torts § 525 (1976)); *In re Chivers*, 275 B.R. 606 (Bankr.D.Utah 2002);

[32] *In re Baines*, 337 B.R. 392, 399 (Bankr. D.N.M. 2006)(quoting *Fowler Bros.*, 91 F.3d at 1375 ("[T]he debtor's intent to deceive the creditor in making false representations to the creditor, may be inferred from the 'totality of the circumstances.'"))

[33] *Young* at 1375.

16

Case 07-01071-m    Doc 67    Filed 11/04/08    Entered 11/04/08 16:49:19 Page 16 of 18

had a subjective intent to defraud the creditor.[34] The Court may logically infer an intent to deceive if the debtor knowingly or recklessly makes a false representation that the debtor knew or should have known would induce another to act.[35]

In order to satisfy the reliance element of §523(a)(2)(A), a party need only have justifiably relied on the misrepresentation. Justifiable reliance does not require that the creditor prove that he acted consistent with ordinary prudence and care.[36] The final element of §523(a)(2)(A) requires the creditor to establish the harm caused by the debtor's fraudulent misrepresentations.[37]

Plaintiff alleges that Defendant made false representations while he was supervising the construction of the Second Street Home. She introduced evidence and testimony of false representations by the Defendant in that he obtained funds to pay subcontractors that he did not hire. Specifically, Defendant presented Plaintiff with bids from Chavez Concrete for the construction of the foundation in order to obtain funds. Then, contrary to this representation, Defendant had Expert Framing, his own company, perform the work. Defendant also testified that although he presented Plaintiff with a bid from Barraza Construction for materials and labor involved in hanging the drywall, he did not retain Barraza. Mr. Gallegos' testified that Defendant asked him to create proposals and/or invoices in order to obtain funds from the Plaintiff. Mr. Gallegos specifically testified that "I was asked to forge documents to give to

---

[34] *Id.*

[35] *Hill v. Horst (In re Horst)*, 151 B.R. 563, 568 (Bankr.D.Kan. 1993)

[36] *Chivers*, 275 B.R. at 622 (A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation.)

[37] *Id.* at 621-622

17

[Plaintiff]." These actions establish that the Defendant had intent to deceive Plaintiff. The Plaintiff justifiably relied on Defendant's representations that the funds she made payable to Expert Framing were for payment of the subcontractors identified by the Defendant and for building materials and supplies. But, Plaintiff fails to prove any damages that would be additional to those the Court finds she is entitled to under §523(a)(4).

This opinion constitutes the Courts findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. An appropriate order will be entered.

_____
MARK B. McFEELEY
United States Bankruptcy Judge

Date entered on docket: November 4, 2008

Copies to:

Steven Tal Young
20 First Plaza NW, Suite 500
Albuquerque, NM 87102
*Attorney for Laurie Williams*

Steven Mazer
2501 Yale SE 2nd Floor
Albuquerque, NM 87106-2907
*Attorney for Steve Lobato*

18